IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | |
| | ) | No.  38863-8-III |
| C.G. | ) | (Consol. w/ No. 38864-6-III) |
| | ) | |
| In the Matter of the Parental Rights to | ) | UNPUBLISHED OPINION |
| | ) | |
| N.G., Jr. | ) | |

SIDDOWAY, J. — The father of now-five-year-old C.G. and eight-year-old

N.G. Jr. appeals the order terminating his parental rights.

Almost three years into dependency proceedings for the children, the social

worker assigned to their cases by the Department of Children, Youth and Families

(Department) learned that the father had reported during a 2014 psychological evaluation

that he had suffered a head trauma and concussion four years earlier.  Based on this

information, the social worker recommended a neuropsychological evaluation that was

court-ordered in November 2021.  An evaluation was scheduled for April 2022, the

earliest available date.

A few months earlier, however, trial of the Department's petition to terminate the

father's parental rights had been set to begin in mid-January 2022.  The trial went

forward, and evidence presented demonstrated that the father had a high attempted

participation rate in court-ordered services but failed to demonstrate progress in the important area of his mental health. He had repeatedly been discharged by providers for angry, emotional or otherwise disruptive behaviors. For that reason, a court order ending all contact with his children had been entered in April 2021 and a modification permitting therapeutic visits via Zoom had led to only a couple of short visits thereafter, ending in August 2021. The children were reportedly doing well in an adoptive family. Presented with this evidence, the trial court found that the Department had met its burden and terminated the father's parental rights.

The father argues persuasively on appeal that where a traumatic brain injury might explain the behaviors that led to the failure of services, clear, cogent, and convincing evidence does not establish that all necessary services reasonably available and capable of correcting his parental deficiencies within the foreseeable future had been offered and provided. We reverse the order terminating the father's parental rights and remand for further proceedings consistent with this opinion.

FACTS AND PROCEDURAL BACKGROUND

In or about June 2018, the mother of the father's two children abandoned the family, leaving the father to rear the children on his own. C.G., his daughter, was then one year old and N.G. Jr., his son, was then three. The mother later voluntarily relinquished her parental rights.

2

Nos. 38863-8-III and 38864-6-III (consolidated)
*In re Parental Rights to C.G. and N.G., Jr.*

By September 2018, the Department had received intake reports suggesting the father was overwhelmed by single parenting and might be struggling with mental health and substance abuse problems, as well as housing insecurity. Shaylyn Gunnels, an employee with the Department's Family Assessment Response Division, paid a visit to the father and the children. She observed that the father appeared to particularly struggle parenting N.G. Jr., who displayed traits of autism. The father agreed to involve Family Preservation Services (FPS), an in-home supportive program offered by the Department.

Alyssa Brudnicki, an FPS social worker, visited the father and the children. She, too, noted that N.G. Jr. appeared to have high needs and that the father's preoccupation with the mother's absence negatively affected his parenting abilities:

> Oftentimes [the father] would talk about the kids'—his previous partner . . . —[and] . . . become very upset[,] . . . which led to his inability to pick up cues, like the children crying and needing comforting or asking for food or those type of caretaking tasks.

Rep. of Proc. (RP) at 343. Ms. Brudnicki also observed that the father took alcohol into the bathroom during her visit and continuously stepped out to take sips, despite denying a substance misuse problem. After a month and a half of working with the father, assisting him with scheduling appointments for the children and providing FPS funds for needed child care equipment and supplies, she concluded that he father could benefit from more frequent Department contact and support and referred his case to the Department's

3

Intensive Family Preservation Services (IFPS) division. IFPS is able to offer a broader range of services, including appointment transportation.

*Dependencies are triggered*

The father's relationship with IFPS ended abruptly in October 2018 following a report to law enforcement by an IFPS therapist and an intake received by Child Protective Services (CPS) on October 23, 2018, that N.G. Jr. appeared to have been physically abused. The report of physical abuse came from nurse practitioner Kathryn Ormsby, who had examined N.G. Jr. at a routine medical appointment and found significant bruising across his back and bottom. The father's explanation was that N.G. Jr. fell off his bunkbed and had also taken a tumble at his preschool, but in Ms. Ormsby's opinion, the "level of bruising was [the result of] blunt force trauma." RP at 311. She was the source of the intake to CPS and contacted Partners with Families and Children, a child advocacy center.

Ms. Ormsby also observed during that time frame that N.G. Jr. appeared to be on the autism spectrum. Shortly after the October appointment, Dr. Nalini Gupta diagnosed N.G. Jr. with autism.

Following the CPS report, Ms. Gunnels paid a visit to the father's home, observed the bruising on N.B.G. Jr., and sent photos to a Department forensic specialist. She began preparing dependency petitions.

4

Nos. 38863-8-III and 38864-6-III (consolidated)
*In re Parental Rights to C.G. and N.G., Jr.*

Dependency petitions were filed in October 2018, shelter care hearings were conducted, and the children were placed in foster care. Supervised visitation was ordered for the father twice a week for two hours at a time. Two months later, in December 2018, the father stipulated to the children's dependency. Among the requirements of the agreed disposition order were that the father:

(a) Successfully complete a chemical dependency assessment and any recommended treatment.

(b) Participate in random testing with Cordant Health Solutions as recommended by treatment providers or the DCYF social worker and obtain negative test results. Oral swabs approved; 30 days, then only upon reasonable suspicion. If positive or no show then 30 days re-starts.

(c) Successfully complete a psychological evaluation . . . and follow all recommendations.

(d) Successfully complete a scheduled parenting assessment . . . and follow all recommendations.

(e) Successfully complete an evidence-based parenting program with a provider approved by the parties or ordered by the court and follow all recommendations.

(f) Successfully complete mental health treatment/individual counseling . . . and follow all recommendations.

(g) Successfully complete domestic violence assessment . . . and follow all recommendations.

. . . .

(l) Maintain regular visitation with the child[ren] and attend all scheduled visitations. The father shall not be under the influence of drugs and/or alcohol at the visit.

Ex. P4, at 4-5.

5

The father attended dependency review and other hearings in March, June, and October 2019; March and September 2020; and May, June and November 2021. He completed or attempted a number of the required services, but was unable to demonstrate progress in mental health treatment, anger management and family therapy, as testified to by multiple providers.

*Psychological evaluation and mental health treatment*

In June 2019, six months after entry of the dispositional order, Dr. Walter Mabee conducted a psychological evaluation of the father. Dr. Mabee observed that the father "was generally polite," "presented with at least average intelligence," and "seemed to be more than competent . . . to engage in the psychological evaluation." RP at 147. Dr. Mabee learned that the father had his GED[1] and was presently unemployed due to a physical disability (a back injury). Dr. Mabee thought it significant that the father had his GED because "an individual who has a GED typically has sufficient intellectual capabilities or cognitive processing capabilities to be able to understand information . . . whether it's counseling or . . . parent training classes . . . and . . . should be able to profit from those types of experiences." RP at 149.

Based on psychological testing, Dr. Mabee diagnosed the father with a personality disorder and mood disturbance order, which he concluded impaired the father's ability

---

[1] General education development degree or certificate.

6

"to engage appropriately with intimate [partners and to] sustain[ing] parenting behavior." RP at 152. The father's scores for acute depression, suspiciousness, anger, and interpersonal sensitivity "were all within the clinical range; in other words . . . greater than you would expect in a—in a general individual." RP at 153. Dr. Mabee suspected that the father tended to minimize his alcohol use, but noted he was living in a clean-and-sober house at the time of the evaluation.

Based on his observations, Dr. Mabee recommended the father enroll in individualized counseling, avoid using substances, and participate in parent training classes, particularly for N.G. Jr. Dr. Mabee noted the father's report that he was not taking and had not previously taken psychotropic medications, and his comment that he did not believe in pills. Dr. Mabee did not discuss medication with the father, since the depression and anxiety the father exhibited was only in the mild to moderate range.

Over the course of the dependency, the Department was required to refer the father to multiple therapy and visitation service providers. Although he often made progress in initial sessions and no provider questioned his sincere commitment to his children, he was repeatedly discharged by providers due to an inability to get along with staff, follow rules, and make adequate treatment progress.

Jessica Kaluza was one of the first therapists to offer individual and family therapy for the father and the children. As with Ms. Brudnicki, the FPS social worker, Ms.

7

Kaluza noted in her initial assessment that the father often missed basic cues from the children and required prompting as to how to appropriately interact with them. After the third session, she discharged the father from further sessions following an emotional outburst by the father when he was told he could not take both children into the office's small restroom at the same time for a diaper change. She noted that in response to the father's escalation, the children "actually did not react, which is a trauma response." RP at 215; *see also* RP at 219 ("I would describe [the children's] attachment as fearful avoidant."). After his discharge, she recommended further mental health therapy, a psychological evaluation and medication management. At the termination trial, the father's lawyer questioned Ms. Kaluza about whether the father's behavior was consistent with someone who had a traumatic brain injury:

> Q.     Does [the father] show any signs of having a traumatic brain injury?
>
> A.     I would say that part of my recommendation for a psychological evaluation was I just didn't know. And so I knew that there . . . were symptoms that were outside of what I would diagnose and I would want someone who's more specialized to look [at] that.
>
> Q.     Sure. But did he show many signs, classic signs, of having a traumatic brain injury, did he not?
>
> A.     He did.

RP at 223-24. On redirect, the Department's lawyer obtained Ms. Kaluza's agreement that the father's mood swings, inability to read the room and follow cues, and impulsivity, while signs of a traumatic brain injury, are "also signs of other diagnoses,

8

which is why it was important that he receive [a] psychological evaluation." RP at 224.

She testified that they could indicate a pervasive mental health disorder; she "just knew

. . . these symptoms were pretty extreme and I needed to make a recommendation."

RP at 225

Following his discharge from Ms. Kaluza's office, the Department arranged for

the father to meet with Patricia O'Neill for individual and family therapy. The father met

with Ms. O'Neill for about a year and a half, from approximately May 2019 through

November 2020. For group sessions, the family often engaged in outdoor play therapy at

a park.

Ms. O'Neill generally painted a more positive portrayal of the father than his other

providers. She observed that "there was an affectionate appropriate relationship between

he and the children" and that he was committed to "show[ing] up" and "working on

issues related to reunification." RP at 235. Asked about anxiety or negative behaviors

from the children during play therapy, she attributed them more to their placement in

foster care and Department-scheduled appointments than to the father's behaviors. She

testified, "I did not see [the father] at any time demonstrate any anger or inappropriate

behavior towards the kids. And he was receptive to my suggestions about how to ease

anxiety around transitions." RP at 240.

9

Ms. O'Neill vacillated in response to the question of whether the father's discharge was due to her own unwillingness to host Zoom/video therapy sessions during COVID and personal affairs or the father's behaviors. She later clarified that the father's behavior and failure to make progress played a role in her decision to discharge him:

> A.      I didn't have a conflict with him but I had a deal with him.
>
> Q.      Okay.
>
> A.      And the deal was engage in these services that are recommended or required by the court and I will continue to work with you, and if you do not engage in these services, then I'm going to terminate this counseling relationship. And—and that definitely played into me dismissing him . . . .
>
> . . . .
>
> Q.      Okay. And during [the time you saw him], he was—must have been engaging, because he was continuing the services with you, then?
>
> A.      Well, I—I tend to give people, you know, a lot of space and room and chances and one more time and one more time. And I . . . I just had to create a boundary around going forward. And [I had] gone through a really, really difficult personal time [after] losing my older brother, [and] . . . I just said, "This is it. You know, I've been beating this drum for 18 months, and you keep having the same issue. And we can work for another year on—on reunification, but if these other things aren't happening, it's not going to happen."

RP at 259; *see also* RP at 265 (Ms. O'Neill confirming to the court that one of the reasons for the discharge was the father's failure to make adequate progress).

Like Ms. Kaluza, Ms. O'Neill testified that she thought the father could potentially benefit from medication management but stressed that the role of deciding that was better left to a psychiatrist or physician.

At or around the same time, therapist Julie Rudmann provided counseling services to the father and the children. As with Ms. Kaluza and Ms. O'Neill, Ms. Rudmann discharged the father due to concerns with his engagement. She noted that while he made initial progress, he often struggled to focus on the topic at hand and the children in subsequent sessions. While her observed interactions of him and the children were "overall . . . positive," she noted he still needed to work toward accepting N.G. Jr.'s autism diagnosis and stated that he continued to lack "insight into his own emotional well-being and how that impacted the kids." RP at 362-63. She discharged him following his cancellation of several sessions.

The father was next seen by mental health counselor Taya Zavala, who worked with him individually from his discharge with Ms. O'Neill for almost a year (from November 2020 through October 2021). She, too, perceived that he sometimes struggled to stay on the topic of his own behaviors. He was discharged following a litany of issues with staff that ranged from him playing his music too loudly to failing to wear his mask and ultimately culminated in a confrontation in October 2021. Ms. Zavala explained that it appeared the father understood the skills she wanted him to use in strengthening his emotional regulation, but he appeared to fail to actually apply those skills. At the termination trial, the father's lawyer asked her about the necessity of a psychiatric evaluations and medication management:

Q.       . . . Do you know typical symptoms of traumatic brain injuries?

. . . .

A.       Um, difficulty concentrating and focusing, forgetting things, difficulty remembering . . . and paying attention.

Q.       What about regulating emotions?

A.       That I don't know.

. . . .

Q.       . . . Do you think that [medication] could have been . . . a useful tool for [the father]?

A.       Yes.

Q.       Okay.  And then a psychiatric evaluation as well?

A.       Yes.

RP at 397-98.

The father next met with David Wilson from September 2020 through April 2021 for individual and family counseling.  Unlike the other providers, Mr. Wilson stated that the father sometimes behaved inappropriately towards the children and was aggressive with him personally.  He observed the father grow angry and dysregulated with N.G. Jr. and C.G. when they referred to their foster parents as "mom" or "dad," and testified the father accused the foster parents of not feeding and abusing the children directly in front of N.G. Jr. and C.G.  He also sometimes asked inappropriate leading questions, such as "Would you like to come home with me?"  RP at 569.  Once, in an elevator with C.G.'s foster parents, the father apparently yelled, "You'll never be her father" and threw down a toy in front of the children.  RP at 563.  He also yelled at a volunteer transportation

12

officer after he perceived her grab N.G. Jr.'s arm—reportedly to stop N.G. Jr. from running into traffic. In another instance, he tried to show the children a horror film before Mr. Wilson shut it down.

The father also experienced tension with Mr. Wilson personally. The father struggled to follow some of Mr. Wilson's clinic's rules, such as not bringing in outside food. When Mr. Wilson explained to the father that his clinic decided to discharge him due to the combination of behavioral issues he was having, the father threatened him, telling him "[d]on't rock the boat" and "[i]f you push, you'll see how hard I can push back. . . . You'll find out." RP at 570. Despite these struggles, Mr. Wilson testified that the father truly loved his children, and his anger was coming from a place of "just really hurting and [feeling] like nobody kind of cared about . . . what was going on with his kids. . . . I believe it was more so passion and . . . need[ing] and wanting to be understood." RP at 575.

The final therapist the father met with was Tabitha Wyatt, who provided family therapy for about three months beginning in summer 2021. The father behaved inappropriately towards Ms. Wyatt, kissing and hugging her at the end of their first session without her consent. From then on, it was decided that all therapy sessions with Ms. Wyatt and the children would be over Zoom to prevent any untoward physical contact by the father. However, before transitioning to fully remote therapy, Ms. Wyatt

returned to the father's house to help him set up a tablet for Zoom and stayed in-person for the first Zoom session. When Ms. Wyatt went to the father's house to help him to set up the tablet, the father was dysregulated and physically aggressive. He made inappropriate remarks and promises to the children and threatened the foster parents. When the foster mother ended the call, the father grew angry and threw something from the kitchen across the room by Ms. Wyatt's face. She noticed that he had jabbed a knife into his kitchen ceiling.

Thereafter, Ms. Wyatt conducted all sessions via Zoom. Her relationship with the father quickly deteriorated due to the father's unwillingness to engage in online sessions and Ms. Wyatt's cutting Zoom sessions short when he grew angry at the children. She terminated him from care following him sending her multiple aggressive text messages and inappropriate images, and for his general unwillingness to engage in one-on-one sessions.

*Visitation problems*

Visitation was also disrupted by the father being discharged from multiple visitation services due to his unsafe interactions with the children, visitation facilitators, and inability to follow the rules.

At the beginning of the dependency, the father was offered family visitation through Better Futures Together. He was discharged after only a month following

14

inappropriate behaviors, including one instance where he grabbed the children from the visit facilitator and attempted to run away, and another where he grabbed N.G. Jr. aggressively by his arm and dragged him across the parking lot, causing him to cry.

Other service providers indicated that they believed the father was intoxicated for some of his visits. At Crossroads Visitation, where the father was to receive visitation following his discharge from Better Futures Together, he only had one session before he was terminated from services. The father had been informed that the children's visit that day had been pushed from 9 a.m. to 10 a.m. but nonetheless showed up at 9 o'clock and grew agitated when the children were not there. He went outside, and when he returned at 10 o'clock, staff noted he smelled of alcohol and the program's chemical dependency professional determined the visit should not proceed. The father refused to leave until law enforcement was called.

Similarly, at Reunified Services, where the father received biweekly visitation from June 2021 for approximately four to five months, visitation facilitator José Uresti observed during one visit that the father appeared to be under the influence, which led facilitators to attempt to end the visit early. The father became upset and tried to open the rear car door where the children were sitting as Mr. Uresti was backing the vehicle out to leave, at which point law enforcement was called. After the children left, the father texted Mr. Uresti a photo of a person hanging.

15

Other facilitators, including Mr. Uresti, noted that the father's interactions with the children were sometimes inappropriate. Consistent with Mr. Wilson's observations, Mr. Uresti explained that the father "had great visits most of the time," but other times "just exploded and lost it" in front of the children. RP at 718. Likewise, Zoey Kepple of UNITE Family Services, a visitation facilitator that supervised visits between December 2019 and February 2020, testified about instances when she was required to make unusual incident reports (UI reports) regarding the father's aggression towards the children or staff. In one instance, the father grabbed C.G. in a harsh manner and kicked the toy firetruck N.G. Jr. was playing with out from underneath him, which caused him to fall face first. Another time, a UI report was generated because C.G. was consistently mimicking the father's use of curse words despite staff instructions to the father not to swear in front of the children. A later UI report documented the father's refusal to take C.G. to the bathroom when she was toilet training despite her asking to go to the restroom, and then delayed changing her when she had an accident. Finally, Ms. Kepple noted that the father sometimes appeared to favor C.G. over N.G. Jr. and struggled to interact with N.G. Jr. when he was feeling overwhelmed.

By contrast, Dorothy Bancroft, a different visitation facilitator for UNITE, testified that most of her interactions with the father were positive. At the same time, on

16

cross, she testified that she sometimes felt nervous in interacting with the father due to his

volatility and anger about the case.

*Substance abuse and domestic violence treatment classes*

The father's progress in substance abuse and domestic violence classes was mixed.

He completed alcohol and drug information school, as well as a parenting class for

fathers. On the whole, however, the father was unreceptive to taking classes to improve

his parenting skills and anger management. He failed to participate in 8 of 10 sessions

offered by an applied behavioral analysis therapist for parenting children with autism. He

failed to complete the recommended domestic violence course and yelled at staff and

front office workers in the office where the class was held. At a screening for substance

usage, the results indicated that the father was not being entirely truthful about his

alcohol consumption and the provider had to resort to collateral information from the

Department and criminal records to determine whether the father could benefit from a

course on drugs and alcohol.

*Emergence of a prior head injury as an issue*

Three social workers were assigned to work with the father over time, due to

resignation and reassignment of Department staff during the dependencies. The cases

were originally assigned to Abraham Choate. They were reassigned to Lisa Emory in

17

July 2020. In approximately May 2021, social service specialist Emily Haisten took over as the lead on the father's case, with Ms. Emory continuing to play a secondary role.

Ms. Haisten had previous experience as an investigator for the Department of Social and Health Services, and she had continued access to electronic resources that most other social workers lacked, including "Barcode," a database that includes medical evaluations of parents receiving Department services. Ms. Haisten decided to search Barcode for the father's information. From that search, she identified records from a psychological evaluation of the father conducted by a Dr. Quackenbush in 2014. It mentioned the father's report to Dr. Quackenbush that he had been hit in the head with a hammer in 2010, rendering him unconscious. A memory evaluation was included, which scored the father "on the lower end." RP at 870. Although the record of Dr. Quackenbush's evaluation did not include a recommendation that the father receive a neurological evaluation, Ms. Haisten believed that one would be appropriate based on what she learned from the 2014 evaluation and her knowledge that the father had been in mental health counseling for a long time without much progress. When Ms. Haisten spoke to the father directly about undergoing a neurological evaluation; he was not agreeable.

On September 21, 2021, the superior court entered an amended schedule order setting the termination of parental rights trial to begin on January 18, 2022. The amended

18

schedule order followed a final substitution of attorneys for the father, after a series of four or five withdrawals and substitutions of counsel during the dependencies. In a shared planning meeting with the father's new attorneys on September 29, 2021, the attorneys let Ms. Haisten know that the father would be agreeable to neuropsychological and psychiatric evaluations and would potentially be amenable to taking medication prescribed by a licensed psychiatrist. Following that agreement, both a neuropsychological and psychiatric evaluation were identified as new court-ordered services at the last November 2021 dependency review hearing taking place before the scheduled January 2022 termination trial date.

Ms. Haisten recommended the father participate in psychiatric services in the community, but could not make a direct referral since the Department lacked contracted service providers offering psychiatric appointments. Instead, she told the father he could obtain a referral to a psychiatrist from Frontier Behavioral Health or from his primary care physician. By the time of the termination trial, the father had not obtained a psychiatric evaluation.

The father also had not yet had a neuropsychological examination. Ms. Haisten testified that after that was court-ordered, she was initially informed by the Department's contracted providers that there would be a two-year wait for such an evaluation. Later,

however, a provider reported availability in April 2022, and an appointment was scheduled. As of the January 2022 trial the evaluation obviously had not taken place.

At the termination trial, the father's lawyers questioned Department witnesses about whether they had identified neuropsychological and psychiatric evaluations as a needed service, and in some cases, why they had not. Mr. Choate testified that he had not referred the father to a psychiatrist or for a neuropsychological evaluation. He also acknowledged that he had also not referred the father to anyone for medication management, although that had been recommended by Ms. Kaluza.

Ms. Emory testified that in conversations with the father, he never mentioned having suffered a head or brain injury, a concussion, or unconsciousness. She had reviewed a domestic violence evaluation report which affirmatively indicated that the father had *not* ever suffered a traumatic brain injury. She testified that she had felt the father might benefit from medication and had expressed that view to him, but he was resistant. She testified that she felt so strongly about it that she had even contacted the father's former lawyer in December 2020 to request that she speak with the father about trying medication. She testified that neither Dr. Mabee nor any other provider had ever recommended that the father undergo a neurological examination. She expressed that in retrospect, the perseveration and lack of impulse control the father exhibited might have been caused by a brain injury.

20

Like Ms. Emory, Ms. Haisten believed that the father could benefit from a psychiatric evaluation and possibly medication prescribed by a medical doctor. When she initially recommended these services, he was not interested, but he had changed his mind and agreed in the end of August 2021.

Dr. Mabee was questioned about why he had not recommended a neurological assessment and testified that he would do so if an individual had suffered multiple head injuries and there was a concern that apart from problematic behaviors, the the brain might not be operating correctly. He testified he had no report of that in this case, and given the father's education, language ability and attention during the evaluation, he did not see red flags that would cause him to recommend a neurological evaluation. He testified that an individual's erratic behavior and problems regulating their emotions can be consistent with a traumatic brain injury, and if those personality issues were accompanied by information about a prior traumatic brain injury, a neuropsychological evaluation might be appropriate.

The Department called the father as a witness toward the end of its case. He was hostile. He repeatedly accused the social workers and Department-contracted providers assigned to his case of being more interested in exercising their control than in trying to reunify his family. He protested:

> I tried to follow the rules. But, you know, it's like every woman in my life, just I'm tired of it. I've got a Me-Too headache, because all the way down

from you,[2] the department, Lisa Emory, Emily Haisten, Kerry Holliday [the GAL], no one's given me a chance to reunify with my kids . . . .

RP at 904; *see also* RP at 920 (referring to women involved in the case as "Karen[s]" who were easily offended).

The father testified that he believed he needed no other services and had made adequate progress with the services provided, although he also testified he would willingly participate in other services if that would resolve the termination petition in his favor.

The father was not questioned by the Department or cross-examined about whether he had suffered a head injury, was amenable to taking medication, or whether he felt he could benefit from a psychiatric or neurological exam.  In closing argument, the Department's lawyer reminded the court that a number of witnesses had testified to the father's resistance to taking medication, "so that wasn't something that became a recommendation until very recently."  RP at 1058.[3]  The father's lawyer argued in closing that the proceeding was premature because the father had not yet received a psychiatric or neuropsychological evaluation.

---

[2] Ms. Vidoni, the Department attorney questioning him, is a woman.

[3] It is reported that following this statement, the father interrupted, "I don't want to . . . take pills" followed by something indistinguishable.  Since the indistinguishable language that followed might be an important qualifier, we decline to attach importance to the reported statement.  RP at 1058.

22

Nos. 38863-8-III and 38864-6-III (consolidated)
*In re Parental Rights to C.G. and N.G., Jr.*


At the conclusion of what had been a taxing six-day hearing,[4] the trial court took

the matter under advisement, stating she wished to review the relevant case law as well as

the testimony. She reconvened the parties several weeks later to announce her decision.

In announcing it, she highlighted the most difficult issue presented at trial and on appeal,

stating that she

> considered very closely [counsel's] good argument that [the father] should
> have time to complete the neuropsych that's scheduled for April. And I . . .
> applaud Ms. Haisten for recommending that, doing what she needs to do
> . . . because that's what we need to be doing is constantly trying to reunite
> and give people the ability to be good parents. I get the argument. I don't
> . . . have any evidence that a neuropsych evaluation is going to remedy
> conditions or improve his parental deficiencies. There's no evidence before
> the court as to how the discovery of cognitive deficits would be treated or
> even if they could be treated in order to remedy conditions or improve
> parental deficiencies.
>
>    Now, I go back to the fact that [the father] has denied that he's ever
> had a head trauma or head concussion or a bonk on the head. He wasn't
> asked at trial if he did. He didn't testify that he had experienced head
> trauma. Dr. Mabee found no cognitive delays. He found that [the father]
> . . . could benefit, if he embraced it, if he had the ability to have some
> insight, could benefit from services.

RP at 1109-10.

The court terminated the father's parental rights. The father appeals.

---

[4] The father repeatedly interrupted witnesses, the attorneys and the court
throughout the trial.

Nos. 38863-8-III and 38864-6-III (consolidated)
*In re Parental Rights to C.G. and N.G., Jr.*


ANALYSIS

"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). Because parents have a fundamental liberty interest in the custody and care of their children, the State may terminate parental rights "'only for the most powerful [of] reasons.'" *In re Welfare of S.J.*, 162 Wn. App. 873, 880, 256 P.3d 470 (2011) (alteration in original) (internal quotation marks omitted) (quoting *In re Welfare of A.J.R.*, 78 Wn. App. 222, 229, 896 P.2d 1298 (1995)).

Washington statutes respond to this constitutional command by providing a two-step process before a court may terminate parental rights. Under the first step of the analysis, courts evaluate "the adequacy of the parents," one element of which is whether "the services ordered [to be provided to the parent] . . . have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d); *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 478, 379 P.3d 75 (2016). The second step of the termination process looks to the best interests of the child. *Id.*

24

The father contends that because the Department did not prove that neuropsychological and psychiatric evaluations were offered or provided, it failed to satisfy the first step of the process. He contends that in any event, the Department failed to prove that termination was in the best interest of his children. He makes related assignments of error to a handful of the trial court's findings of fact.[5]

I.  GIVEN WITNESS TESTIMONY THAT A NEUROPSYCHOLOGICAL EVALUATION WAS A RECOMMENDED COURT-ORDERED SERVICE THAT MIGHT IDENTIFY TREATMENT FOR THE FATHER'S DYSREGULATION, THE REQUIREMENT OF RCW 13.34.180(d) WAS NOT PROVED

The first, "adequacy of the parents" step of the two-step process requires the State to prove six statutory elements. The first three are procedural and are seldom in dispute.[6] Where a termination decision is appealed, it is the State's proof of the remaining elements that are most often challenged. In this case it is only one: the State's

---

[5] As detailed in his identification of issues, the father assigns error to the trial court's findings that court-ordered and necessary services were offered or provided (V), the elements of RCW 13.34.180 were met (VI(1)), the father failed to report having suffered a brain injury (V(6)), a query about prior brain injury on a domestic violence assessment was checked "no" and no provider recommended a neurological exam (V(31)), Ms. Haisten testified that no service would correct the father's deficiencies, (V(32)), it is presumed from the passage of 12 months from the disposition order without improvement that there is little likelihood deficiencies will be remedied so the children can be returned within the near future (VI(1)), all providers tried to correct the father's parental deficiencies (VI(2)), and there is no evidence that delaying trial and completing the neuropsychological evaluation would lead to the discovery of treatable cognitive deficits (VII). Br. of Resp't at 2-7.

[6] The three rarely disputed elements appear at RCW 13.34.180(1) (a)-(c) and deal with findings, orders, and timelines that are made or pass before the termination trial.

25

requirement to prove "[t]hat the services ordered [to be provided to the parent] have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided." RCW 13.34.180(1)(d). Like the other six elements, the Department must prove this by "clear, cogent, and convincing evidence." *In re Welfare of A.B.*, 168 Wn.2d 908, 911, 232 P.3d 1104 (2010). "Clear, cogent and convincing evidence exists when the evidence shows the ultimate fact at issue to be highly probable." *In re Dependency of K.S.C.*, 137 Wn.2d 918, 925, 976 P.2d 113 (1999).[7]

In reviewing a trial court's decision to terminate parental rights, we will uphold its factual findings "if supported by substantial evidence from which a rational trier of fact could find the necessary facts by clear, cogent, and convincing evidence." *Id.* "Because of the highly fact-specific nature of termination proceedings, deference to the trial court is 'particularly important.'" *K.M.M.*, 186 Wn.2d at 477 (quoting *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)). We defer to the trial court's determinations

---

[7] In addition to finding the six statutory elements, due process requires that a court make a finding of current parental unfitness before parental rights can be terminated. *In re Dependency of K.R.*, 128 Wn.2d 129, 142, 904 P.2d 1132 (1995) (citing *Santosky*, 455 U.S. at 747-48). This finding need not be made explicitly, and satisfying all six of the statutory elements raises an implied finding of parental unfitness. *K.M.M.*, 186 Wn.2d at 479.

26

of witness credibility and the persuasiveness of the evidence. *Id.* We review de novo whether its findings of fact support its conclusions of law. *Id.*

The Department responds to the father's challenge to its proof of this first step of the process by arguing that neuropsychological and psychiatric evaluations were not a necessary service, a neuropsychological evaluation was not reasonably available, the evaluations would have been futile, and they would not have remedied the father's parental deficiencies in the foreseeable future.

> A. The Department did not prove by clear, cogent, and convincing evidence that neuropsychological and psychiatric evaluations were not a necessary service

"[N]ecessary services" are those "needed to address a condition . . . preclud[ing] reunification of the parent and child." *In re Dependency of A.M.M.*, 182 Wn. App. 776, 793, 332 P.3d 500 (2014). In evaluating which services are necessary, the Department must "identify a parent's specific needs and provide services to meet those needs," tailoring them to the needs of the individual. *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 924, 385 P.3d 268 (2016). It was undisputed at the termination trial that the father's mental health was one of his deficiencies. Ms. Haisten identified the significant mental health concerns that had led to the father being unable to control his behaviors as his principal deficiency. *See* RP at 876.

27

Ms. Haisten testified that upon learning of the father's possible brain injury, she recommended neuropsychological and psychiatric evaluations and at the September 29, 2021 shared planning meeting, the father's lawyers reported he would participate in them. At the November 2021 dependency review, they were court-ordered. Ms. Emory testified that she had felt strongly that the father might benefit from medication and in retrospect, that the perseveration and lack of impulse control the father exhibited might have been caused by a brain injury. Even Dr. Mabee testified that an individual's erratic behavior and problems regulating their emotions can be consistent with a traumatic brain injury, and if those personality issues were accompanied by information about a prior traumatic brain injury, a neuropsychological evaluation might be appropriate.

The Department first argues that a neuropsychological evaluation was not a necessary service because it was only late in the dependencies that Department personnel became aware that the father might have suffered a brain injury. Br. of Resp't at 35-37. No legal authority is cited, nor does the Department make a reasoned argument why a delay in recognizing that a service is necessary makes it unnecessary.

The trial court points out that during the trial, the father did not present evidence that he had suffered a brain injury or that he continued to be willing to be evaluated and medicated if a brain injury was the cause of his disruptive behaviors. But it was the Department's burden to prove that the requirements of RCW 13.34.180(1) had been met,

by clear, cogent, and convincing evidence. It was not the father's burden to prove that they had *not* been met. The Department did not prove that these recommended and court-ordered services were not necessary services.

> B.　Both services were "reasonably available" but only a psychiatric evaluation was proved by the Department to have been offered or provided

The Department next contends that a neuropsychological evaluation was not "reasonably available," and that a psychiatric evaluation had been adequately provided. The meaning of "reasonably available" in RCW 13.34.180(1)(d) is informed by RCW 13.34.136, which dictates the Department's obligations in developing a permanency plan for a child ordered removed from the home. RCW 13.34.136(2)(b)(vii) provides that the Department "shall provide all reasonable services that are available within the department, or within the community, or those services which the department has existing contracts to purchase."

Ms. Haisten testified that it was a contracted provider who proved available to schedule the father for a neuropsychological evaluation in April 2022. The Department argues that the April 2022 date, being after the trial date, means "the service was not reasonably available." Br. of Resp't at 37. It provides no authority that "reasonable availability" is a time-related limitation, given the separate statutory consideration that services required to be offered or provided must be "capable of correcting the parental

29

deficiencies within the foreseeable future."  RCW 13.34.180(1)(d).  Where no authorities are cited in support of a proposition, we may assume that counsel, after diligent search, has found none.  *State v. Manajares*, 197 Wn. App. 798, 810, 391 P.3d 530 (2017) (citing *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962)).  We hold that "reasonable availability" is not a time-related limitation.

The Department presented evidence that the psychiatric evaluation *was* provided. Ms. Haisten testified that the Department does not have contracted providers for psychiatry, so it provides the parent with community resources that provide the service. She testified that she told the father that either Frontier Behavioral Health or his primary care doctor could refer him to a psychiatrist.  The father provided no contrary evidence.

C.    The Department did not present clear, cogent, and convincing
        evidence that the neuropsychological evaluation would have
        been futile

"The provision of services is futile where a parent is unwilling or unable to participate in a reasonably available service that has been offered or provided."  *K.M.M.*, 186 Wn.2d at 483.  The futility rule "derives from cases in which the State made repeated offers of services but eventually gave up after the parent refused to accept any of those offers."  *In re Parental Rights to B.P.*, 186 Wn.2d 292, 316 n.5, 376 P.3d 350 (2016); *accord In re Welfare of M.R.H.*, 145 Wn. App. 10, 26, 188 P.3d 510 (2008) ("Where the Department offers services, but the parent refuses to participate, RCW 13.34.180(1)(d) is

30

satisfied."). Where the record establishes that the offer of services would be futile, the trial court can make the finding that the Department has offered all reasonable services. *K.M.M.*, 186 Wn.2d at 483.

Straying from this concept of futility, the Department engages in lengthy argument about why a neuropsychological evaluation would not address the father's deficiencies. Br. of Resp't at 40-49. The Department does not point to any testimony by a medical professional that such a neuropsychological evaluation would not provide useful information; instead, appellate counsel simply points to testimony about the father's deficiencies and asks us to accept her argument that information gained from the evaluation would not be helpful.

As already addressed, there was sufficient evidence at trial to establish that the court-ordered neuropsychological evaluation was a necessary service. And while the father had been resistant to medication in the past, Ms. Haisten testified that, represented by new lawyers, he agreed to neuropsychological and psychiatric evaluations along with medication management in late September 2021. The Department fails to demonstrate by clear, cogent, and convincing evidence that providing the neurophysiological evaluation would be futile.

31

> D. The Department presented argument, but no evidence, that the April 2022 neuropsychological evaluation could not result in treatment recommendations that could remedy the father's deficiencies in the foreseeable future

Finally, the Department argues that the impending neuropsychological evaluation could not result in treatment recommendations that could remedy the father's deficiencies in the foreseeable future. Even where the Department "inexcusably fails to offer all necessary services, termination may still be appropriate if the service would not remedy the parent's deficiencies within the foreseeable future." *K.M.M.*, 186 Wn.2d at 486. The "foreseeable future" is determined from the child's perspective, which takes account of the child's age. *In re Dependency of T.R.*, 108 Wn. App. 149, 164, 29 P.3d 1275 (2001).

It is frustrating for us, and was presumably frustrating for the trial court, that despite the importance of this issue—given an evaluation that was scheduled to take place within three months—the Department presented literally no evidence on how quickly any useful information gleaned from a neuropsychological evaluation can be put to use in treatment. We agree with the trial court's finding, on the issue of the impending neuropsychological examination, that

> the court has no evidence that delaying termination in order for [the father] to complete this service *is* going to remedy conditions or improve his parental deficiencies. There is no evidence before the court that the discovery of cognitive deficits *could be* treated in order to remedy conditions or improve parental deficiencies.

32

CP at 534 (emphasis added). But there was no evidence before the court that completing the service *would not* remedy conditions, or that any cognitive deficits *could not* be treated and remedy the parent's deficiencies within the foreseeable future. The Department bore the burden of proof, and the lack of evidence on these scores is the Department's problem, not the father's. "No evidence" cannot satisfy the burden to present clear, cogent, and convincing evidence.

Given this failure of proof of the element required by RCW 13.34.180(1)(d), we conclude that the order terminating the father's parental rights must be reversed and remanded for further proceedings.

II.     BEST INTERESTS OF THE CHILD

The second step of the termination process is for the court to ascertain the best interests of the child. RCW 13.34.190(l)(b). "Because the parent's rights will already have been observed in the first step, this second step need be proved by only a preponderance of the evidence." *A.B.*, 168 Wn.2d at 912.

No specific factors are to be considered in determining the best interests of the child; the analysis is a case-by-case one that looks to the child's specific circumstances. *In re Dependency of A.D.*, 193 Wn. App. 445, 459-60, 376 P.3d 1140 (2016). Because of this nature of the analysis could change in future proceedings, we decline to address it on the current facts.

33

Nos. 38863-8-III and 38864-6-III (consolidated)
*In re Parental Rights to C.G. and N.G., Jr.*

We reverse the order terminating the father's parental rights and remand for further proceedings consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____      _____
Pennell, J.                                  Staab, J.